UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

NM SOLAR GROUP, INC.,                                               Case no. 23-10728

        Debtor.

## OPINION

        Before the Court is the New Mexico Attorney General's motion for a declaration that the automatic stay imposed by § 362(a)[1] does not apply to a prepetition state court action he brought against the Debtor and others, or alternatively for relief from the stay. At issue is whether the action comes within § 362(b)(4), the "police power" exception to the automatic stay. The Court concludes that some of the counts asserted in the action are within the police power exception, while others are not. For the counts subject to the automatic stay, cause has not been shown to grant stay relief.

A.     Facts.[2]

        Debtor and the Attorney General have asked the Court to rule on the motion based on the facts that can be gleaned from the current record. The Court therefore finds:[3]

        The Debtor is a New Mexico corporation. It was in the business of selling and installing residential and commercial solar panel electricity generating systems. Debtor abruptly shut down on August 11, 2023. At the time, it had many outstanding contractual and other obligations and had taken deposits or payments for work that had not been started and/or completed. Warranties paid for by customers likely will not be honored. The shutdown caught most people off guard

---

[1] Unless otherwise indicated, all statutory references are to 11 U.S.C.
[2] Some of the Court's findings may be in the discussion section of the opinion.
[3] The Court took judicial notice of the docket in this case. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (approving such judicial notice); *In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

because recent public statements made by Debtor's representative indicated that the future was promising for Debtor's business.

The Attorney General brought an action against Debtor on August 21, 2023, styled *State of New Mexico ex rel. Raul Torrez v. NM Solar Group Inc., et al.*, case no. D-101-CV-202302015, in the First Judicial District Court, State of New Mexico (the "State Court Action"). The State Court Action includes two counts under the New Mexico Unfair Practices Act, N.M.S.A. § 57-12-1 et seq. ("UPA") (for violation of the UPA and for injunctive relief), and three counts under New Mexico common law (unjust enrichment, fraud, and negligence). The alleged wrongdoings included not only misrepresentations about Debtor's financial condition but also about how long it takes to install the solar systems, expected electricity savings, and available tax credits and rebates. The prayer for relief asks for compensatory and punitive damages, treble damages, attorney fees, civil penalties, interest, disgorgement, restitution, and declaratory and injunctive relief.

Debtor filed this chapter 7 case a week later. It is an asset case. A January 9, 2024, bar date was set and a bar date notice was mailed to about 6,400 creditors, mostly Debtor's current and former customers. 290 proofs of claim were filed, including about 250 filed by customers. The Attorney General filed a proof of claim for $0 on October 3, 2023, based on "[a]lleged violations of the New Mexico Unfair Practices Act." A copy of the State Court Action complaint is attached to the proof of claim.

The Attorney General filed the subject motion on December 13, 2023. On January 3, 2024, the Attorney General served a notice of deadline to object to the motion. Debtor timely objected. The contested matter has been fully briefed. The Court held a preliminary hearing on the motion on March 13, 2024. At the hearing, the parties declined the opportunity to provide evidence at a final hearing, instead asking the Court to rule on the briefs and the facts available from the record.

Although the motion is titled "Motion for Relief from Automatic Stay" and the Attorney General asked for stay relief in the opening paragraph as an alternative, the rest of the motion is devoted entirely to arguing that the automatic stay does not apply. The Attorney General did not argue for stay relief or attempt to show that "cause" exists to modify the stay. Nevertheless, the Court will address the alternative request.

The motion alleges that 140 of Debtor's customers lodged complaints about Debtor with the Attorney General's office. The identities of the customers was not disclosed, so the Court cannot tell which of these customers also filed proofs of claim.

B.      The New Mexico Unfair Practices Act.

The UPA makes unlawful certain unfair, deceptive, and unconscionable trade practices. The statute includes a non-exhaustive list of 19 unfair or deceptive trade practices, N.M.S.A. § 57-12-2(D), as well as a general definition of unconscionable trade practices N.M.S.A. § 57-12-2(E). The UPA grants standing to the Attorney General to bring claims for violation of the statute:

> A. Whenever the attorney general has reasonable belief that any person is using, has used or is about to use any method, act or practice which is declared by the Unfair Practices Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the state alleging violations of the Unfair Practices Act. The action may be brought in the district court of the county in which the person resides or has his principal place of business or in the district court in any county in which the person is using, has used or is about to use the practice which has been alleged to be unlawful under the Unfair Practices Act.
>
> B. In any action filed pursuant to the Unfair Practices Act, including an action with respect to unimproved real property, the attorney general may petition the district court for *temporary or permanent injunctive relief and restitution*.

N.M.S.A. § 57-12-8 (italics added). The restitution remedy is discussed in N.M.S.A. § 57-12-9:

> A. In lieu of beginning or continuing an action pursuant to the Unfair Practices Act, the attorney general may accept a written assurance of discontinuance of any practice in violation of the Unfair Practices Act from the person who has engaged in the unlawful practice. The attorney general may require an agreement by the person engaged in the unlawful practice that, by a date set by the attorney general and stated in the assurance, he will make *restitution to all persons of money,*

> *property or other things received from them in any transaction related to the unlawful practice. . . .*

(italics added). Finally, the UPA allows the Attorney General to recover civil penalties:

> In any action brought under Section 57-12-8 N.M.S.A. 1978, if the court finds that a person is willfully using or has willfully used a method, act or practice declared unlawful by the Unfair Practices Act, the attorney general, upon petition to the court, may recover, on behalf of the state of New Mexico, a civil penalty of not exceeding five thousand dollars ($5,000) per violation.

N.M.S.A. § 57-12-11.

In addition to the Attorney General's right to enforce the UPA, "persons" damaged by unfair or unconscionable practices are given the private remedies of injunctive relief, § 57-12-10(A), actual damages, § 57-12-10(B), treble damages if the practice was willful, § 57-12-10(B), and attorney fees. § 57-12-10(C). The Attorney General is not a "person" within the definition. N.M.S.A. § 57-12-2(a)

C.  <u>The Automatic Stay and the Police Power Exception</u>.

Section 362(a) provides in part:

> [A] petition filed under section 301 . . . operates as a stay, applicable to all entities, of . . . the continuation . . . of a judicial . . . action or proceeding . . . against the debtor that was . . .commenced before the commencement of the case under this title . . . .

§ 362(a)(1). However, the automatic stay does not apply to:

> . . . the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power . . . .

§ 362(b)(4). The Tenth Circuit discussed this "police power" exception in *Eddleman v. U.S. Dept. of Labor*, 923 F.2d 782 (10th Cir. 1991), *overruled in part on other grounds by Temex Energy, Inc. v. Underwood, Wilson, Berry, Stein & Johnson*, 968 F.2d 1003, 1005 n.3 (10th Cir. 1992). Mr. Eddleman, a mail hauler for the U.S. Postal Service, filed a chapter 11 bankruptcy case in August

1986. Nine months later the U.S. Department of Labor brought an administrative action against him, alleging that he underpaid workers and failed to keep adequate pay records, in violation of the Service Contract Act, 41 U.S.C. §§ 351-358 (the "SCA"). The Department sought to liquidate claims for back pay due to employees and to add Mr. Eddleman to a list of SCA violators.

In response to the administrative action, Mr. Eddleman filed an adversary proceeding to enforce the automatic stay. At issue was the scope of the police power exception. Discussing whether the Department's action came within the exception, the Tenth Circuit held:

> Of course, not every agency action against a debtor can be characterized as one that enforces "police or regulatory power." Consequently, courts have developed two tests for determining whether agency actions fit within the exception. Under the "pecuniary purpose" test, the court asks whether the government's proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property and not to matters of public policy. *See Edward Cooper Painting,* 804 F.2d at 942; *In re State of Missouri,* 647 F.2d 768, 776 (8th Cir.1981), *cert. denied,* 454 U.S. 1162, 102 S. Ct. 1035, 71 L. Ed. 2d 318 (1982). If it is evident that a governmental action is primarily for the purpose of protecting a pecuniary interest, then the action should not be excepted from the stay. In contrast, the "public policy" test distinguishes between government proceedings aimed at effectuating public policy and those aimed at adjudicating private rights. *See Edward Cooper Painting,* 804 F.2d at 942. Under this second test, actions taken for the purpose of advancing private rights are not excepted from the stay. *See id.*

*Id.* at 791. The Tenth Circuit then applied the tests to the Department's administrative action:

> In the case at bar, we conclude that DOL's enforcement proceedings are exempt from the stay under either test. The remedies sought by DOL are not designed to advance the government's pecuniary interest. DOL's pursuit of debarment and liquidation of back-pay claims was primarily to prevent unfair competition in the market by companies who pay substandard wages. Although we do not feel bound to apply it, we also conclude that the "public policy" test presents no barrier to DOL's actions. Despite the fact that DOL sought liquidation of back-pay claims for specific individuals, we do not characterize the use of that remedy as an assertion of private rights. We conclude instead that the request for liquidation of back-pay claims was but another method of enforcing the policies underlying the SCA. Our conclusion is bolstered by the fact that the back-pay claimants would not receive any extra priority by virtue of the DOL action. Actual collection of the back-pay claims must proceed according to normal bankruptcy procedures. Accordingly, we hold that DOL's enforcement proceedings in this case were exempt from the automatic stay under section 362(b)(4).

*Id.*

D. <u>Applying *Eddleman* to the UPA counts</u>.

1. <u>Declaratory and injunctive relief</u>. The case law is uniform that seeking declaratory or injunctive relief under state consumer protection laws is a classic exercise of police power. *See, e.g., In re Energy Guard Midwest LLC*, 595 B.R. 588, 592 (Bankr. D. Kan. 2018) (seeking declaratory and injunctive relief for violation of consumer protection laws is a quintessential police and regulatory function); *JSS of Albuquerque, LLC*, 2017 WL 3575654, at *7 (Bankr. D.N.M.) (seeking declaratory relief carries out the public policy of the UPA, rather than pursuing the state's pecuniary interest); *In re Charter First Mortg., Inc.*, 42 B.R. 380, 384 (Bankr. D. Ore. 1984) ("totally appropriate" for the state to proceed in state court to attempt to obtain an injunction under Oregon's version of the UPA); *In re Nelson*, 240 B.R. 802, 804-05 (Bankr. D. Me. 1999) (to the same effect). These cases rightly conclude that the relief, if warranted, vindicates the public policy against unfair trade practices, rather than protecting a state pecuniary interest or adjudicating private rights. The Court concludes that the police power exception applies to the Attorney General's request for declaratory and injunctive relief under the UPA.

2. <u>Civil penalties</u>. The Court concludes that the Attorney General's request for civil penalties also comes within the police power exception. Civil penalties serve to punish past violations and are primarily for protection of the public. *See, e.g., JSS*, 2017 WL 3575654, at *8 (so holding); *Energy Guard Midwest*, 595 B.R. at 593 (citing and following *JSS*); and *Charter First*, 42 B.R. at 384 (same). This is so even though the state would be the incidental beneficiary of any civil penalties awarded and collected.

It should be noted, however, that in chapter 7 cases civil penalty claims are subordinated to general unsecured claims. *See* § 726(a)(4). The chance of the Attorney General collecting any portion of a civil penalty judgment is very small. The parties should take this into account when deciding whether and/or how much to litigate about civil penalties.

3. <u>Restitution</u>. The Attorney General's restitution request is made on behalf of Debtor's customers and seeks to adjudicate private rights. *See, e.g., New Mexico ex rel. King v. Capital One Bank (USA)*, 980 F. Supp. 2d 1346, 1353 (D.N.M. 2013) (restitution claims under the UPA are an "exclusively private interest"); and *New Mexico ex rel. King v. HSBC Bank Nevada, N.A.*, 2013 WL 12138908, at *3 (D.N.M.) (attorney general's restitution claim under the UPA "is seeking monetary recovery on behalf of New Mexico consumers").[4] The restitution remedy therefore appears to fail the public policy test.

However, restitution may also effectuate, to some degree, a public policy, i.e., by making unfair trade practices unprofitable. Because of this public policy component, it can be argued that "hybrid" government actions like restitution come within the police power exception. There is case law support for this position. *See, e.g., Energy Guard Midwest,* 595 B.R. at 593-94 (Kansas's restitution claim under the state consumer protection statute is not stayed); *In re Berry*, 2019 WL 3992719, at *3 (Bankr. S.D. Fla.) (restitution count fell within the state's police and regulatory powers); *In re Nelson*, 240 B.R. 802, 806 (Bankr. D. Me. 1999) (same); *In re Guardia*, 522 B.R. 734, 736 (Bankr. S.D. Fla. 2014) (same); and *In re First Alliance Mortg. Co.*, 263 B.R. 99, 110 (9th Cir. BAP 2001) (same).

How would the Tenth Circuit rule on whether a hybrid government action comes within the police power exception? The Court concludes that, following *Eddleman*, such hybrid actions would pass the public policy test if, and only if, the public policy component predominates. In *Eddleman* the Tenth Circuit held that the back-pay claims were "*primarily* to prevent unfair competition in the market by companies who pay substandard wages," 923 F.2d at 791 (italics

---

[4] These cases apply *Rex, Inc. v. Manufactured Hous. Comm.*, 119 N.M. 500 (S. Ct. 1995), which held that there is a privity of interest between a consumer and the state of New Mexico to the extent a state consumer protection statute gives a state agency the authority to bring an action on the consumer's behalf.

added). This clearly is a public policy. Later the circuit held: "[d]espite the fact that DOL sought liquidation of back-pay claims for specific individuals, we do not characterize the use of that remedy as an assertion of private rights." *Id.*

In contrast to the SCA's back-pay claims, the restitution remedy under the UPA primarily seeks to adjudicate private rights. *See King v. Capital One*, 980 F. Supp. 2d at 1353 (restitution claims are an "exclusively private interest"); *JSS*, 2017 WL 3575654, at *8 (the public interest in restitution claims is minimal); and *King v. HSBC Bank*, 2013 WL 12138908, at *3 (restitution claims are brought on behalf of consumers). The public policy aspect of the remedy is minor, not primary. The Court therefore concludes that the restitution count is stayed. For other cases reaching the same conclusion *see JSS*, 2017 WL 3575654, at *8; *Charter First*, 42 B.R. at 385 (the objective of a restitution action is to aid in the collection of property for third parties and does not come within the § 364(b)(4) exception); *In re Dunbar*, 235 B.R. 465, 475 (9th Cir. BAP 1999) ("To the extent the state agency instituted proceedings to seek restitution ... for ... violations of the Business and Professions Code in that amount, such state actions are not excepted from the automatic stay") (citation omitted); *In re Poule*, 91 B.R. 83, 87 (9th Cir. BAP 1988) (following *Charter First* and holding that an agency's order of correction was essentially a restitution order and was stayed); *In re Berg*, 198 B.R. 557, 562 n. 11 (9th Cir. BAP 1996) ("Sanctions which are essentially a restitution order may not be within the § 362(b)(4) public policy exception") *In re Draughon Training Institute, Inc.*, 119 B.R. 921, 925 (Bankr. W.D. La. 1990) (restitution claim not an exercise of the state's police power); *Chao v. Hospital Staffing Services, Inc.*, 270 F.3d 374, 391 (6th Cir. 2001) (action under the Fair Labor Standards Act that merely sought to recover unpaid minimum wages, unpaid overtime, and liquidated damages did not come within the exception because such action only incidentally served the public interest).

It may be that in some jurisdictions a minimal or incidental public interest is enough for a hybrid government action to pass the public policy test. The Court does not believe *Eddleman's* version of the public policy test is so broad.[5]

Furthermore, as a policy matter such an expansive reading of the *Eddleman* tests would add significant and needless expense to cases like this one, where the corporation is in liquidation and the bar date has passed. The Attorney General's restitution count in the State Court Action would be difficult to try. While the complaint does not identify any of Debtor's customers, they would have to be individually listed, and their respective restitution damages calculated, before a state court restitution judgment could be entered. For customers who did not file a proof of claim by the bar date, getting such a restitution judgment would be futile.[6] For customers who did file timely proofs of claim, on the other hand, a restitution judgment is no longer necessary. Compared to the Bankruptcy Code's efficient claims administration process, litigating the restitution count in the State Court Action would be cumbersome, expensive, and wasteful.

4. <u>Actual damages and treble damages</u>. The same conclusion must be drawn regarding the Attorney General's request for actual (compensatory) damages and treble damages. These damages are awardable in connection with the private remedies available to "persons" harmed by Debtor's unfair trade practices. The remedies are, by definition, the assertion of private rights, not public policy, and therefore are stayed.

---

[5] *See also Martin v. Occupational Safety and Health Review Com'n*, 941 F.2d 1051, 1054 (10th Cir. 1991) (Baldock, J.) (citing *Eddleman* for the proposition that "we may review proceedings involving the determination and entry of a monetary penalty because the government's police or regulatory power is involved.").

[6] *See, e.g., In re Hawker Beechcraft, Inc.*, 2015 WL 6163569, at *4 (Bankr. S.D.N.Y.) ("[i]f his invocation of § 362(b)(4) is meant to imply that the EEOC or KHRC is still investigating other claims, these other claims are not included in his proofs of claim, and moreover, would presumably be barred because he never asserted them prior to the bar date").

Furthermore, although the Attorney General is given the right to seek restitution on behalf of "persons," he is not given the right to bring actions to enforce the private remedies given to "persons" under § 57-12-10. *See, e.g., State ex rel. Stratton v. Gurley Motor Co.*, 105 N.M. 803, 806 (Ct. App. 1987) ("The UPA authorizes the attorney general to pursue injunctive relief and restitution to injured persons, in addition to actions for civil penalties for willful violations of the Act. The UPA also authorizes private actions for actual or statutory damages, injunctive relief, and attorneys fees."). The private remedies must be pursued by the harmed persons themselves.

5. <u>Attorney fees</u>. The Attorney General relies on N.M.S.A. § 57-12-10(C) for his request for an attorney fee award. That reliance is misplaced. The award of attorney fees under that subsection is a private remedy, and not available to the Attorney General. Without a basis for awarding attorney fees, the Court cannot find that the police power exception applies to the attorney fee request.

6. <u>Interest</u>. Interest can be awarded in connection with a New Mexico judgment. *See* N.M.S.A. §§ 56-8-4(B) (pre-judgment interest) and 56-8-4(A) (post-judgment interest). As the automatic stay does not apply to the Attorney General's civil penalty remedy, neither is he stayed from seeking pre- or post-judgment interest on any resulting civil penalty judgment. However, as postpetition interest on unsecured claims is not allowable, *see* § 502(b)(2)[7] the state's limited resources might be better spent elsewhere.

---

[7] Some states enacted versions of the UPA that allow the attorney general to recover attorney fees incurred in bringing an action for violation of the statute. *See, e.g., Charter First*, 42 B.R. at 384, and RCWA § 19.86.090 (the State of Washington can be awarded attorney fees in an action to enforce its Consumer Protection Act). New Mexico's UPA does not. [7] *See also E.E.O.C. v. Rath Packing Co.*, 787 F.2d 318, 327 (8th Cir. 1986) ("Section 502(b) provides that as of the date of the bankruptcy filing, interest will not accrue and any claims for unmatured interest which become due after the filing date shall be disallowed.") (footnote omitted).

7. <u>Punitive damages and disgorgement</u>. The Attorney General asks for punitive damages[8] and disgorgement[9] in the State Court Action. Neither remedy is available under the UPA. Presumably the remedies are sought in connection with the common law claims, discussed below.

E. <u>Applying *Eddleman* to the Common Law Counts</u>.

The Attorney General brought unjust enrichment, fraud, and negligence counts against Debtor. The Court concludes that the counts do not come within the police power exception because they seek to adjudicate private rights rather than advance a public policy. *See above*. Where the public policy aspect of the restitution claim is minimal, it is nil in the common law counts. The common law counts are stayed.

F. <u>The Attorney General's *Parens Patriae* Standing to Bring the Common Law Counts</u>.

The Attorney General alleges that the common law counts are brought "pursuant to its *parens patriae* authority for the purpose of protecting its citizens from unfair and deceptive trade practices." The *parens patriae* doctrine was examined by Judge James A. Parker in *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292 (D.N.M. 2018):

> "'Parens patriae standing has been explained on the ground that the plaintiff state is not merely advancing the rights of individual injured citizens, but has an additional sovereign or quasi-sovereign interest.'" *Satsky*, 7 F.3d at 1469 (quoting 17 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4047 at 223 (1988)). "In order to maintain [a *parens patriae*] action, the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 607, 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982). "The State must express a quasi-sovereign interest." *Id.* "[A] state may not sue to assert the rights of private individuals." *Satsky*, 7 F.3d at 1469; *see also Snapp*, 458 U.S. at 602, 102 S. Ct. 3260 (private interests do not

---

[8] Customers cannot be awarded both punitive damages and treble damages for an alleged violation of the UPA that also constitutes fraud—they must pick one. *Hale v. Basin Motor Co.*, 110 N.M. 314, 320 (S. Ct. 1990).

[9] Disgorgement is an appropriate remedy for unjust enrichment. *See, e.g., Miller v. Bank of America, N.A.*, 352 P.3d 1162, 1169 (N.M. 2015). The Attorney General conceded that disgorgement is subject to the automatic stay.

> become quasi-sovereign "simply by virtue of the State's aiding in their achievement."). "[I]f the State is only a nominal party without a real interest of its own[,] then it will not have standing under the *parens patriae* doctrine." *Snapp*, 458 U.S. at 600, 102 S. Ct. 3260.

*Id.* at 1310. Here, the state, acting through the Attorney General, has no interest of its own in the common law counts; it is merely a nominal party. The counts are not brought for New Mexicans generally but for the very small percentage of New Mexico citizens who allegedly were harmed by Debtor's unfair trade practices. Debtor was already out of business when the Attorney General filed the State Court Action, so the number of aggrieved parties is finite and, to judge by the motion and the proofs of claim, 250 or less. While the state has an interest in enforcing the UPA, that interest is effectuated through the UPA's injunctive and civil penalty remedies. The state has no quasi-sovereign interest in the common law counts. The Court concludes, therefore, that the Attorney General lacks *parens patriae* standing to bring the counts, so the scope of police power exception as applied to those counts is moot.[10]

G.     The Effect of Debtor's Legal Status on the *Eddleman* Analysis.

*Eddleman* was a chapter 11 case; Mr. Eddleman hoped to reorganize his business and emerge from bankruptcy. Because of that, there was no reason to treat the Department of Labor's police power differently for him than for someone not in bankruptcy. This case, in contrast, is a corporate liquidation under chapter 7. While Debtor's assets will be liquidated and distributed to creditors, Debtor will not get a discharge. *See* § 727(a)(1). Shorn of assets but with all liabilities intact, the risk of Debtor rising again to commit more unfair trade practices is vanishingly small.

Despite Debtor's corporate demise, the Attorney General apparently wants to litigate the State Court Action as though Debtor were still in business. Because the *Eddleman* tests do not

---

[10] The Court may address standing issues sua sponte. *See, e.g., Mackin v. OM Sai Corp.*, 588 F. Supp. 3d 1243, 1247 (D.N.M. 2022), citing *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013).

-12-
Case 23-10728-t7     Doc 113     Filed 04/24/24     Entered 04/24/24 16:05:54 Page 12 of 18

differentiate between "live" targets like Mr. Eddleman and "zombie" targets like Debtor, the Court cannot reach a different result under the *Eddleman* tests than if this case were a reorganizing chapter 11. This somewhat counterintuitive conclusion is supported by the case law: courts addressing the police power exception in corporate chapter 7s treat them the same as reorganizing chapter 11s. *See, e.g., In re Asset Control Co. of North Carolina*, 90 B.R. 192, 194-95 (Bankr. D.S.C 1988) (the court allowed the attorney general to proceed with an action under South Carolina's unfair trade practices act for declaratory and injunctive relief, restitution, civil penalties, and attorney fees, without discussing the effect of chapter 7); *N.L.R.B. v. 15th Ave. Iron Works, Inc.*, 964 F.2d 1336, 1337 (2d Cir. 1992) (the automatic stay in a corporate chapter 7 did not apply to the NLRB's unfair labor practice proceedings); *In re Lenz Oil Service, Inc.*, 65 B.R. 292, 294 (Bankr. N.D. Ill. 1986) (the State of Illinois' environmental enforcement action against a chapter 7 corporate debtor came within the police power exception); *Perez v. Cargill Heating & Air Conditioning Co., Inc.*, 2014 WL 5325372, at *2, n.2 (W.D. Wis. 2014) (the police power exception applies in both chapter 7 and chapter 11, and the fact that an individual debtor's bankruptcy is a chapter 7 is not material); *I.C.C. v. Lifschultz Fast Freight Corp.*, 151 B.R. 150, 152 (N.D. Ill. 1993) (the police power exception applied to the ICC's action to enforce its regulatory power against corporate chapter 7 debtor); *In re Family Vending, Inc.*, 171 B.R. 907, 909 (Bankr. N.D. Ga. 1994) (the state could proceed with its Fair Business Practices Act action against the no-asset chapter 7 corporate debtor); *In re Travacom Communications, Inc.*, 300 B.R. 635, 638 (Bankr. W.D. Pa. 2003) (continued action against corporate chapter 7 debtor was a valid exercise of police power to enjoin future violations of law by debtor's potential successor or assign); *Charter First Mortgage*, 42 B.R. at 384 (debtor's argument that injunctive relief is moot because debtor ceased operations should be addressed to the state court, not the bankruptcy court).

Nevertheless, it seems clear that the public interest in Debtor has shifted, for the most part, from punishing Debtor and protecting the public from unfair trade practices to maximizing the recovery of consumers harmed by Debtor's actions. Thus, the Court hopes that injunctive relief, civil penalties, and interest can be agreed to by the Attorney General and Debtor, without extensive litigation or the intervention of the chapter 7 trustee. At this point, litigation against Debtor in the State Court Action can only hurt, not help, the customers damaged by Debtor's actions.

H. <u>Stay Relief</u>.

Without argument or an attempt to carry his evidentiary burden, the Attorney General has asked for the alternative relief of stay modification so he can litigate any stayed counts.

The Tenth Circuit has held that because "there is no clear definition of what constitutes 'cause,' discretionary relief from the stay must be determined on a case by case basis." *Chizzali v. Gindi (In re Gindi)*, 642 F.3d 865, 872 (10th Cir. 2011), overruled on other grounds, *TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011). "Cause" is considered a fact, not a conclusion of law, and a finding of cause is reversible only if "clear error" was committed. *In re JE Livestock, Inc.*, 375 B.R. 892, 893-94 (10th Cir. BAP 2007).

1. <u>The *Curtis* factors</u>. Motions for relief from the automatic stay are often filed so litigation pending in another forum can proceed to judgment. In such situations the Tenth Circuit "has not set forth a precise framework or exhaustive set of factors for analyzing whether cause exists." *In re Gindi*, 642 F.3d at 872. Courts often turn to twelve non-exclusive factors identified in *In re Curtis*, 40 B.R. 795 (Bankr D. Utah 1984), to assist in the analysis. *See, e.g., In re Busch*, 294 B.R. 137, 141 (10th Cir. BAP 2003) ("Twelve factors were identified in [*Curtis*] as some of

the issues a bankruptcy court might consider when determining whether to lift the stay to permit pending litigation in another forum.").[11] The Court weighs the *Curtis* factors as follows:

| Factor | Discussion |
|---|---|
| (1) Whether the relief will result in a partial or complete resolution of the issues. | Due to the lack of *parens patriae* standing, stay relief would not resolve the common law claims. Furthermore, since the bar date has passed, the restitution count is moot, superseded by the claims administration process. |
| (2) The lack of any connection with or interference with the bankruptcy case. | Stay relief would interfere with the bankruptcy case, if the trustee had to spend estate money to defend the action. |
| (3) Whether the foreign proceeding involves the debtor as a fiduciary. | N/A |
| (4) Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases. | No such specialized tribunal has been established. |
| (5) Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation. | No insurance company has assumed financial responsibility. |
| (6) Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question. | N/A |
| (7) Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties. | Creditors would be prejudiced to the extent the trustee would have to expend estate funds to defend the State Court Action. |

---

[11] The "*Curtis* factors" are: (1) Whether the relief will result in a partial or complete resolution of the issues; (2) The lack of any connection with or interference with the bankruptcy case; (3) Whether the foreign proceeding involves the debtor as a fiduciary; (4) Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases; (5) Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation; (6) Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question; (7) Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties; (8) Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c); (9) Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f); (10) The interest of judicial economy and the expeditious and economical determination of litigation for the parties; (11) Whether the foreign proceedings have progressed to the point where the parties are prepared for trial; and (12) The impact of the stay on the parties and the 'balance of hurt.' *Curtis*, 40 B.R. at 799-800.

| | |
|---|---|
| (8) Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c). | N/A. However, any civil penalty judgment would be subordinate to the claims of general unsecured creditors, per § 726(a)(4). |
| (9) Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f). | N/A |
| (10) The interest of judicial economy and the expeditious and economical determination of litigation for the parties. | Judicial economy would be better served by keeping the stay in place. The bar date has passed, so pursuing the stayed counts now would be a waste of time. Customers who filed claim do not need a state court judgment, while those who did not file claims would not be helped by a judgment. |
| (11) Whether the foreign proceedings have progressed to the point where the parties are prepared for trial. | Because Debtor filed this case a week after the Attorney General filed the State Court Action, there has been no progress in the action. |
| (12) The impact of the stay on the parties and the 'balance of hurt.' | The automatic stay does not hurt the Attorney General. He lacks standing to pursue the common law claims on behalf of the Debtor's customers, and the restitution claims have been superseded by the proofs of claim interested customers filed. There is nothing to be gained by pursuing the restitution and common law claims. |

2.   The *Crespin* factors. The Court issued *In re Crespin*, 581 B.R. 904 (Bankr. D.N.M. 2018), in which it identified certain of the *Curtis* factors, and certain other factors, that often are the most relevant to determining whether to modify the automatic stay to allow a party to proceed with pending litigation in another court.[12] The Court weighs the *Crespin* factors that have not been discussed as part of the *Curtis* analysis:

| Factor | Discussion |
|---|---|
| (1) Whether the nonbankruptcy court is a specialized tribunal. | Discussed above. |

---

[12] The "*Crespin*" factors are: (1) Whether the nonbankruptcy court is a specialized tribunal; (2) Whether granting stay relief would hinder or delay estate administration; (3) Whether the facts of the matter require a deviation from the Court's core function of allowing or disallowing claims; (4) Whether lifting the stay would promote judicial economy; (5) Whether it would be less expensive for the parties to litigate in bankruptcy court; (6) Whether lifting the stay would prejudice other creditors; (7) The movant's likelihood of prevailing in the litigation; and (8) Whether the "balance of the hurt" weighs in favor of stay relief. *Crespin*, 581 B.R. at 908-10.

| | |
|---|---|
| (2) Whether granting stay relief would hinder or delay estate administration. | Estate administration would be hindered if the trustee were required to defend the State Court Action. |
| (3) Whether the facts of the matter require a deviation from the Court's core function of allowing or disallowing claims. | They do not. The Court can readily address any objections to the proofs of claim on file. |
| (4) Whether lifting the stay would promote judicial economy. | It would not. Given the bar date and the fact that Debtor is out of business, judicial economy is better served by keeping the stay in place. |
| (5) Whether it would be less expensive for the parties to litigate in bankruptcy court. | It would be less expensive to litigate in bankruptcy court, focusing solely on the claims on file. |
| (6) Whether lifting the stay would prejudice other creditors. | It would if the trustee were required to spend estate funds defending the State Court Action. |
| (7) The movant's likelihood of prevailing in the litigation. | Due to lack of *parens patriae* standing, the Attorney General is not likely to prevail on the common law claims he brought. Before Debtor filed this case, the Attorney General was likely to succeed in his restitution claim. Now, however, the claim is moot, having been superseded by the proofs of claim filed by customers. |
| (8) Whether the "balance of the hurt" weighs in favor of or against stay relief. | Discussed above. |

The Court finds and concludes that the *Curtis/Crespin* factors weigh heavily in favor of keeping the automatic stay in place for the Attorney General's non-police power counts. Given the Attorney General's standing problems, the bar date, and the 250 proofs of claim filed consumers, nothing would be gained by granting stay relief. The stay relief request must be denied.

Conclusion

The automatic stay does not apply to the Attorney General's requests for declaratory and injunctive relief and civil penalties. The stay does apply, however, to the restitution and common law counts. Further, the Attorney General lacks standing to assert the common law counts or to seek the private remedies available under the UPA. Finally, cause has not been shown to modify the automatic stay for the stayed counts. An order consistent with this opinion will be entered.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: April 24, 2024
Copies to: counsel of record